## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** : | **CRIMINAL NO. 1:11-CR-007** |
| : | |
| v. : | **(Judge Conner)** |
| : | |
| **TYRONE DAVID ROBINSON**, : | |
| : | |
| **Defendant** : | |

### MEMORANDUM

Presently before the court is a motion (Doc. 19) to suppress evidence filed by defendant Tyrone Robinson ("Robinson"). Robinson contends that the length and nature of his traffic stop resulted in an unconstitutional seizure, and that no reasonable suspicion justified an investigative detention. The government claims that the traffic stop and subsequent detention were lawful. Robinson's motion has been fully briefed and is ripe for disposition. For the following reasons, the court will deny the motion.

I.   **Factual Background and Procedural History**

The pending motion arises from the events during and directly following a routine traffic stop. (Doc. 23). Pennsylvania State Police Trooper Justin Hope ("Hope") initiated the traffic stop on the Pennsylvania Turnpike. (Doc. 23 at 1-2). The driver of the vehicle, Robinson, initially pulled over on a narrow shoulder, but after Hope requested that he pull forward, Robinson pulled into the larger parking

area "directly ahead."[1] (Id. at 2). Robinson produced a driver's license, registration, and proof of insurance. All the documents were valid, but the insurance and registration were in another individual's name and were issued from a different state than Robinson's license.[2] (Id.) Robinson explained that he was borrowing the car from his girlfriend to pick up his children and bring them back to New Jersey. (Doc. 20 at 2). Hope noticed a "strong odor" emanating from several pink air fresheners hanging from the rear view mirror, and he observed two cell phones on the center console.[3] (Doc. 23 at 2).

Hope then returned to his patrol car and ran several computer checks on Robinson and the vehicle. He ran a license check, which came back clean; he searched for any outstanding warrants and found none; he verified the registration, which had not been reported stolen; and he conducted a criminal history report, which came back with several entries. (Doc. 30 at 2). The criminal history

---

[1] Hope found it suspicious that Robinson pulled over on the narrow shoulder, directly ahead of a wide parking area, because drivers involved in criminal activity often use this technique to create an unsafe situation for the officer. (Doc. 29 at 9:4-10:8). Presumably, an unsafe situation will ensure that the traffic stop will be relatively short and contact with the officer will be minimal. (Id.)

[2] Hope also found it suspicious that Robinson was operating a vehicle not his own, because drug traffickers often use a borrowed vehicle—this practice makes seizing the vehicle more difficult. (Doc. 29 at 15:11-16:6).

[3] Based on his experience, Hope knew that such air fresheners are often used to mask the smell of illegal drugs, (id.), and that possession of multiple cell phones is characteristic of drug trafficking, (id. at 12).

consisted of three offenses from 1995: two controlled substance violations and one aggravated assault and possession of a firearm. (Doc. 23 at 2-3).

Based upon all of the circumstances that Hope observed, the criminal history, and Hope's knowledge that I-76 is commonly used for drug trafficking, Hope called for backup. (Id.) Hope also sent a message to a K-9 unit, requesting that it remain nearby in the event that the dog would be needed. (Doc. 31 at 4). Approximately thirty minutes into the traffic stop, Cpl. Greg Miller ("Miller") arrived in response to the call for backup. (Id.) Upon Miller's arrival, both Hope and Miller approached Robinson's car—Hope at the driver's window, and Miller on the passenger side. (Doc. 30 at 2). Hope posed further questions to Robinson about his trip. (Doc. 31 at 4). Hope found it odd that Robinson would be planning to traveling with his child, age 11, to New Jersey on a school day. (Id.)

Hope and Miller then returned to the patrol car and ran additional computer history checks for another five minutes. (Doc. 30 at 3). After completing the computer checks, Hope returned to Robinson's car, and asked Robinson to accompany him to the rear of the vehicle. (Doc. 31 at 4). Hope informed Robinson that he would issue a warning, and, after asking if Robinson was carrying any weapons, he conducted a physical pat-down search. (Doc. 30 at 3). Forty minutes after the traffic stop began, Hope issued the warning to Robinson, returned the paperwork and license, and advised him that he was "good to go." (Id.) Although Robinson believed that he was free to go at this time, Hope testified that, based on

the circumstances, he would not have allowed Robinson to have taken the vehicle. (Id. at 7-8).

Before Robinson reached the driver's door, Hope called him by his first name and asked if he would be willing to answer a few more questions. (Doc. 31 at 4). Robinson voluntarily returned to the rear of his car to speak with Hope. (Id.) One minute into the conversation, Hope requested to search Robinson's vehicle. (Doc. 30, at 4). Robinson declined. (Id.) Hope asked Robinson about his criminal history and indicated that he was concerned about a weapon or other illegal objects being in the vehicle. (Id.) Robinson denied having a criminal history and requested to see the entries on the computer. (Id.). Robinson examined the computer report and again denied the charges. (Id.) Hope then stated that he wanted to get Robinson "on his way," and again requested to search the vehicle. (Id. at 5). Robinson again declined. (Id.)

At this point, Hope requested that the K-9 unit come and sniff the exterior of Robinson's vehicle. (Doc. 31 at 5). Robinson could not leave until this was

accomplished.[4] Ten minutes later, the canine signaled the presence of controlled substances in the vehicle. (Id. at 6). Based on the canine's signal, the officers impounded the vehicle until they could get a warrant. (Doc. 23 at 5). The preceding events transpired over approximately one hour—the traffic stop itself lasting approximately forty minutes, (Doc. 30 at 3), and the subsequent encounter and investigative detention lasting another 17 minutes, (Doc. 31 at 6). After impounding the vehicle, officers obtained a search warrant and located approximately 457 grams of heroin and $1,030. (Id.)

Robinson filed a motion to suppress the evidence found in the vehicle based upon an alleged violation of his Fourth Amendment rights. (Doc. 19 and 20). Robinson claims that the length and nature of the stop resulted in an

---

[4] Hope justifies the brief detention with reasonable suspicion based on the following circumstances:

> (1) the strong odor and number of air fresheners within the Jeep Cherokee, a common tactic used by drug traffickers to mask the odor of narcotics; (2) Robinson's extensive criminal history, including convictions; (3) Robinson's continued denial of this criminal record; (4) the discrepancies between the vehicle's state registration, state where the defendant's driver's license was issued, and the states of their residence; (5) the existence of multiple cell phones characteristic of drug trafficking; (6) the unusual explanation of Robinson's travel that included picking up his children in Pennsylvania and taking them to New Jersey during normal school hours; (7) the unusual manner in which Robinson initially stopped his vehicle on the side of the road; (8) the fact that the Jeep Cherokee was owned by a third party not present inside the vehicle; and (9) the prevalence of drug-trafficking along I-76.

(Doc. 31 at 12).

unconstitutional seizure, and that the officers lacked reasonable suspicion warranting an investigative detention and search under Terry v. Ohio, 392 U.S. 1 (1868). The government filed a brief in opposition to the motion to suppress, (Doc. 23 and 31), claiming that the length of the stop was no longer than reasonably necessary to effectuate its purposes, and that the investigative detention was justified by reasonable suspicion under Terry. The parties filed supplemental briefs following an hearing, and the motion is now ripe for disposition.

## II.   Legal Standard

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. CONST. amend. IV. When an officer has probable cause to believe that a traffic violation has occurred, the officer may stop the vehicle. Whren v. Unites States, 517 U.S. 806, 810 (1996). After a lawful traffic stop, and, upon further inspection, if the officer develops "a reasonable, articulable suspicion of criminal activity," then the officer "may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003). If a reasonable person in the driver's position would feel free to leave after the traffic stop is completed, then the "seizure" for purposes of the Fourth Amendment ends as well. United States v. Drayton, 536 U.S. 194, 204 (2002).

An officer may approach a person in a public place to ask questions. If that person voluntarily speaks with the officer, he is not seized for purposes of the Fourth Amendment. Florida v. Royer, 460 U.S. 491, 497 (1983); see also United

States v. Wilson, 413 F.3d 382, 386-87 (3d Cir. 2005) (requiring, for a consensual encounter following a seizure, that the officer not constrain the driver by an overbearing show of authority).

If an officer has "articulable facts, which taken together with rational inferences from those facts, reasonably warrants [an] intrusion," he may briefly detain an individual. Terry, 392 U.S. at 21. Therefore, following the conclusion of a traffic stop, an officer, with reasonable suspicion, may re-engage the driver to further investigate the validity of his suspicion. The court reviews an investigative detention under Terry with a two-part test: (1) to initiate the stop, did the officer have articulable suspicion that criminal activity was afoot, Terry, 392 U.S. at 30; and (2) did the "police diligently pursue[] a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant," U.S. v. Leal, 235 F. App'x 937, 941 (3d Cir. 2007).

**III. Discussion**

    **A. Length and nature of initial traffic stop**

Robinson does not contest the validity of the initial traffic stop. Rather, he contests the length and nature of the stop. The court finds that the length of the stop was reasonable under the circumstances.

While forty minutes might have been longer than was necessary to issue a warning, Hope outlined multiple circumstances[5] that justified his "expand[ing] the scope of [the] inquiry beyond the reason for the stop." Givan, 320 F.3d at 458. Based on the totality of the circumstances—including air fresheners, the multiple cell phones, the questionable explanation for the trip, and discrepancies with the license, registration, and insurance—the court finds that Hope was justified in taking "longer than expected" to run multiple background checks. (See Doc. 30 at 2). Moreover, based on the criminal history that Hope eventually found, which included a violent offense, the court concludes that Hope was further justified in requesting and waiting for backup. Once the backup arrived, the traffic stop concluded within ten minutes. (Doc. 31 at 4 (stating that the backup arrived at 9:38); Doc. 30 at 3 (stating that Hope informed Robinson that he was "good to go" at 9:48)). Therefore, considering the circumstances of the stop and the interest of officer safety, the court concludes that Hope did not unreasonably expand the nature or length of the initial traffic stop.

**B.     Distinction between the initial traffic stop and the subsequent encounter.**

Robinson argues that the initial traffic stop did not conclude when he was told he was "good to go," but that it continued, uninterrupted, through the end of the dog search. Robinson's primary support for this argument is that Hope

---

[5] See supra note 4 (enumerating the circumstances which were present at this point of time, with the exception of the denial of the criminal charges, which occurred later).

admitted, in the suppression hearing, that Robinson would not have been allowed to leave with the vehicle, even after being told that he was "good to go." (Doc. 30 at 7). Robinson claims that because he was effectively "stranded on the side of the Turnpike, in the middle of December, without a coat, and without a ride to drive him from the scene," he was not actually free to leave. (Id. at 10). This argument rests on Robinson's premise that a seizure ends when "the person was free to leave, not [when] they thought they were." (Id. at 9). The court finds that this premise misstates the law.

Courts use the following standard to determine if a Fourth Amendment seizure is ongoing: whether "the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 439 (1991). This standard does not ask whether the person is actually free to leave. Rather, it asks whether a reasonable person would think he was free to leave. In fact, the Third Circuit stated that the subjective intent of an officer to re-engage a driver after terminating a traffic stop has no bearing on the inquiry, as long as the officer already had sufficient reasonable suspicion to detain the defendant for the purposes of a canine drug search. Leal, 235 F. App'x at 940 (citing United States v. Williams, 271 F.3d 1262, 1271 (10th Cir. 2001), cert. denied, 535 U.S. 1019 (2002)).

In the instant case, the court finds that a reasonable person in Robinson's position would have believed that he was free to leave when Hope said he was "good to go." Hope was not standing in Robinson's way, and Robinson does not

9

claim that Hope did anything a reasonable person would have understood to have indicated an intent to further engage him. In fact, Robinson did believe he was free to go.[6] The court concludes, based on the totality of the circumstances, that a reasonable person would have felt free to leave, and that the subsequent interactions with Hope constituted a separate engagement.

### C. Investigative detention

After concluding the initial traffic stop, Hope called Robinson's name and asked if he would be willing to answer a few more questions. Robinson voluntarily returned to the rear of his vehicle to converse with Hope. This sort of voluntary encounter is not a seizure for purposes of the Fourth Amendment. Royer, 460 U.S. at 497. An officer is free to approach anyone and ask them questions, and that person is free to stop and answer or continue on his way. Id. Robinson chose to stay and speak with Hope. After Robinson had inspected and twice denied the criminal history report on the computer, Hope stated that he wanted to get Robinson on his way, but that a K-9 unit was on its way to sniff his car. The court

---

[6] The court merely takes note of Robinson's subjective belief as an example of what one person believed. However, the court acknowledges that the standard upon which it must base its finding is an objective, reasonable person standard, not a subjective one.

10

finds that, at this point, Robinson was detained, because a reasonable person likely would not have felt free to leave before the dog sniff was completed.[7]

As stated above, the court analyzes Terry stops with a two-part test. First, Hope must have had an articulable suspicion that criminal activity was afoot. Terry, 392 U.S. at 30. In addition to the circumstances that already existed, Robinson's repeated denial of his criminal history contributed to Hope's reasonable suspicion.[8] Although some of the circumstances noted by the government may be subject to innocent explanations, it is not proper for the court to examine each circumstance individually. Rather, the court must consider the "totality of the circumstances—the whole picture." United States v. Sokolow, 490 U.S. 1, 8 (1989). Therefore, taking all of the circumstances together, including Robinson's denial of his criminal history, the court concludes that Hope had reasonable suspicion that criminal activities were afoot. Hope was therefore justified in detaining Robinson.

---

[7] Hope had already asked to search Robinson's vehicle twice, and stated, "I want to get you on your way." (Doc. 30 at 5). As the defense points out, there is a possibility that a reasonable person might interpret that statement to mean that Robinson was not then able to get on his way. This possibility is further strengthened when Hope indicates that Robinson needed to wait for the K-9 to arrive and sniff his vehicle. It was the combination of all of these facts that would lead a reasonable person to believe that he was not free to leave.

[8] The court acknowledges Hope's admission that "there was another . . . alias, another person that was also coming up with that one particular charge." (Doc. 20 at 4 (referring to the aggravated assault and possession of a firearm)). Nevertheless, the court finds that it was reasonable for Hope to have relied on the criminal history because he had no evidence other than Robinson's word that it was inaccurate. Although it did not factor into Hope's suspicion at that moment, the court notes that Hope later received a booking photo, confirming the charge as Robinson's and underscoring the reasonableness of his suspicions.

The second step in the court's analysis is to determine whether the "police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Leal, 235 F. App'x at 941. Approximately ten minutes passed from the time Hope informed Robinson that the K-9 unit was en route to the time the K-9 unit arrived. (Doc. 30 at 5 (stating that Hope informed Robinson that the K-9 was en route at 9:53 and that the K-9 arrived at 10:03)).

Searches in connection with a Terry stop are limited to ensuring officer safety, and may only be completed by a quick, external pat-down of the suspect. Adams v. Williams, 407 U.S. 143, 146 (1972). On the other hand, the Supreme Court has held that a dog search of the exterior of an object does not constitutes a search under the Fourth Amendment. See City of Indianapolis v. Edmond, 531 U.S. 32 (2000) (holding that a dog sniff of the exterior of cars at a legal checkpoint did not escalate the seizure to a search); United States v. Place, 462 U.S. 696 (1983) (holding that the exposure of luggage in a public place to a narcotics dog is not a search). In language that the undersigned finds persuasive, the Eighth Circuit explained that a dog sniff for narcotics "d[oes] not involve entry into the car, it d[oes] not open any closed containers, and it d[oes] not expose to view anything that [is] hidden . . . the sniff of [the] car [is] comparable to other canine alerts evaluated by the Supreme Court, and it d[oes] not rise to the level of a constitutionally cognizable infringement." United States v. Olivera-Mendez, 484 F.3d 505, 512 (8th Cir. 2007) (internal citations omitted).

The court concludes, therefore, that the canine search did not constitute a search under the Fourth Amendment, and was, in fact, a very effective "means of investigation that was likely to confirm or dispel [Hope's] suspicions quickly." See Leal, 235 F. App'x at 941.  The court further concludes that a ten minute wait for the K-9 unit to arrive was not excessive.  Because this Terry stop was a separate encounter from the initial traffic stop, it must be evaluated on its own merits, based on a totality of the circumstances.  The court finds that the brief detention was necessary to investigate Hope's reasonable suspicions, and that it was carried out in a manner designed to confirm or dispel the suspicions quickly.  Therefore, the court concludes that Robinson's detention did not violate the Fourth Amendment.

**IV.    Conclusion**

Based on the forgoing discussion, the court finds that the length and nature of the traffic stop did not result in an unconstitutional seizure, and that Hope had reasonable suspicion to warrant an investigative detention.  The motion to suppress is therefore denied.

An appropriate order follows.

  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:     June 20, 2011

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. 1:11-CR-007** |
| | : | |
| v. | : | **(Judge Conner)** |
| | : | |
| **TYRONE DAVID ROBINSON**, | : | |
| | : | |
| **Defendant** | : | |

## ORDER

AND NOW, this 20th day of June, 2011, upon consideration of the motion (Doc. 19) to suppress filed by defendant Tyrone Robinson, and for the reasons stated in the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 19) to suppress is DENIED.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge